IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **VÍCTOR RAMOS SANTIAGO, ET AL**  <br><br>     Plaintiffs  <br><br>     v.  <br><br>**WHM CARIB, LLC, ET AL**  <br><br>     Defendants | CIVIL No. 14-1087 (SEC)  <br><br>Age Discrimination (PR Law 100); Unjust Dismissal (PR Law 80); Torts and Lost Financial Support |

**STATEMENT OF UNCONTESTED FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE COURT:

COME NOW Defendants, through the undersigned counsel, and pursuant to Local Rule 56(b), submit the following Statement of Uncontested Facts in support of their Motion for Summary Judgment:

1. Víctor Ramos ("Ramos") began working at Río Mar Country Club on August 22, 1987. See Dkt. #113 at p. 4, ¶1.

2. On or around May of 2007, WHM Carib, LLC ("Wyndham Río Mar") acquired the Hotel property from Westin and Ramos became an employee of Wyndham on May 10, 2007. See Exhibit 1, Ramos' deposition at p. 36, l. 7-14; see also Exhibit 2.

3. At the time he became a Wyndham Río Mar employee, and on various occasions thereafter, Ramos acknowledged receipt of Wyndham's Business Principles Book and Wyndham's Employee Handbook. See Exhibit 3.

4. Wyndham has a well-established policy prohibiting any type of discrimination and has exercised reasonable care to prevent and correct promptly any such behavior. See Exhibit 4, Wyndham's Employee Handbook at p. 6-7.

5.      Ramos acknowledged receipt and had knowledge of the aforementioned, yet did not complain to Wyndham Río Mar's management of discrimination of any kind. See Exhibit 3; see also Exhibit 6, Wyndham Río Mar's Answers to Plaintiffs' Set of Interrogatories and Requests for Production of Documents, ¶14.

6.      Wyndham's Business Principles Book provides, in pertinent part, that

> Employees are required to avoid any relationship or activity that might create or give the appearance of a conflict between their personal interests and the interests of Wyndham Worldwide or its subsidiaries.
>
> . . .
>
> Employees must disclose any relationship that appears to create a conflict of interest to their manager, the Business Unit Compliance Officer or the Wyndham Worldwide Enterprise Compliance Officer. Employees must also obtain written pre-approval before proceeding with any transaction, conduct or investment that creates or appears to create a conflict of interest, such as engaging in personal business transactions that arise from or are based upon a position of authority.
>
> . . .
>
> [A]dditional examples of potential conflicts of interest that may require disclosure and/or pre-approval [includes h]olding a second job that may interfere with your employment duties at Wyndham Worldwide.

See Exhibit 5, Wyndham's Business Principles Book at p. 21-22.

7.      On June 6, 2011, Ramos acknowledged receipt of Wyndham's Tips Policy. See Exhibit 7.

8.      Specifically, Ramos acknowledged, in pertinent part, that "it is my responsibility to properly report on a daily basis all charge and cash tips which I receive. I also understand that failure to do so could result in disciplinary action up to and including termination." Id.

2

9. At the time Wyndham Río Mar took over the Hotel, Ramos and Herminio Figueroa occupied the positions of Tournament Coordinators. See Exhibit 1, Ramos' deposition at p. 44, l. 3-11.

10. As Tournament Coordinator, Ramos was "[r]esponsible for overseeing all aspects of tournament operations and assisting the Head Golf Professional with the supervision of the overall golf operation." See Exhibit 8.

11. According to Ramos, his duties as Tournament Coordinator was to "work with the persons who used to come for tournaments . . . m[e]et with them, [] coordinate[] the type of tournament they wanted, ha[ve] meetings with food and beverage [staff] for what the [client] wanted, the whole list of players . . . have everything ready . . . the carts ready and work with the staff so they could have everything ready, coordinate the parking . . . the range where they're going to practice." See Exhibit 1, Ramos' deposition at p. 48, l. 10-24, and p. 49, l. 1-3.

12. Figueroa eventually was promoted to the position of Golf Operations Manager, and Ramos, as Tournament Coordinator, reported to Figueroa. See Exhibit 1, Ramos' deposition at p. 42, l. 21-24, p. 43, and p.47, l. 14-22.

13. Wyndham Río Mar is aware that Ramos had a relationship with the PGA Puerto Rico Chapter for many years and that he worked on their behalf on certain golf tournaments, including the Puerto Rico Open. See Exhibit 6, Wyndham Río Mar's Answers to Plaintiffs' Set of Interrogatories and Requests for Production of Documents, ¶20.

14. Wyndham Río Mar, however, had no knowledge of the specific nature of said relationship, how the relationship started and who was involved. See Exhibit 6, Wyndham Río

Mar's Answers to Plaintiffs' Set of Interrogatories and Requests for Production of Documents, ¶20.

15. At no time was Ramos authorized to work simultaneously as a Wyndham Río Mar employee and for the PGA. See Exhibit 6, Wyndham Río Mar's Answers to Plaintiffs' Set of Interrogatories and Requests for Production of Documents, ¶20.

16. As far as Wyndham Río Mar was concerned, any work that Ramos did for the PGA was on his free time and Wyndham Río Mar had no knowledge as to how he was compensated by the PGA. See Exhibit 6, Wyndham Río Mar's Answers to Plaintiffs' Set of Interrogatories and Requests for Production of Documents, ¶20.

17. The College of Engineers and Land Surveyors of Puerto Rico ("CELS") held its Annual Convention at Wyndham Río Mar from August 9 thru 12, 2013. See Exhibit 9; see also Exhibit 1, Ramos' deposition at p. 140, l. 4-18.

18. The CELS Annual Convention included a wide array of activities within Wyndham Río Mar, such as conferences, exhibitors, assemblies, elections, board meetings, breakfasts, brunches, lunches, and dinners, among others. See Exhibit 9. To such effects, personnel from different departments of the Hotel were involved. Id.

19. As part of the CELS' Annual Convention, a Pro Am Golf Tournament sponsored by the CELS was also coordinated to take place at Wyndham Río Mar's golf course on August 8, 2013. See Exhibit 10.

20. On July 16, 2013, Marissa Gasparoli ("Gasparoli"), CELS' Event Planner, sent an email to Ramos regarding several matters related to the CELS' sponsored golf tournament. In pertinent part, Gasparoli asked Ramos if she and Engineer Ángel Luis Rodríguez could visit

Wyndham Río Mar on Monday July 22, 2013, to see the golf courses. Ramos responded that he did not know whether he would be working on that day, but that, in any case, his supervisor Herminio Figueroa could assist them. See Exhibit 11.

21. Several other emails were subsequently exchanged between Gasparoli, Ramos and Figueroa regarding the CELS representatives' pre-tournament visit to Wyndham Río Mar golf courses. See Exhibit 12.

22. On July 24, 2013, a meeting was held at Wyndham Río Mar's Country Club between engineers Eduardo Reyes and Eduardo Rivera from the CELS, and Víctor Ramos and Jeff Willenberg from Wyndham Río Mar, where the details regarding the golf tournament were discussed. See Exhibit 13; see also Exhibit 1, Ramos deposition at p. 147, l. 18-24, and p. 148, l. 1-20.

23. Prior to the golf tournament, the CELS agreed it would pay the golf tournament participants a cash prize totaling $3,000.00. See Exhibit 1, Ramos' deposition at p. 152, l. 7-14; see also Exhibits 14 and 15.

24. On July 24, 2013, Gasparoli sent an email to Ramos requesting that a $3,000.00 invoice be prepared for the CELS, indicating that it corresponded to the prize for golf professionals. See Exhibit 14.

25. On July 27, 2013, Ramos prepared and submitted an invoice to the CELS in the amount of $3,000 corresponding to the prize money for the Golf Pro's participating in the CELS' sponsored golf tournament. See Exhibit 16.

26. Ramos specifically asked the CELS to prepare the check payable to himself, Víctor Ramos, as Tournament Coordinator for the PGA Island Chapter, South Florida Section. See Exhibit 16.

27. Ramos, however, provided his Wyndham email account for contact in case of any questions. See Exhibit 16.

28. Upon receiving Ramos' invoice, Gasparoli immediately forwarded it to other CELS' representatives, indicating as follows:

> Attached is the invoice (in letter format) sent to us **by the person in charge at Río Mar** ("encargado de Río Mar" in Spanish), as requested by me for payment to the Tournament Pros.

See Exhibit 17. (Translation and emphasis ours).

29. All electronic communications made by Ramos regarding the coordination of any golf tournament, including golf tournaments not held at or involving the Wyndham Río Mar, were made using his Wyndham Río Mar's computer and email account, and during Ramos' working hours at Wyndham Río Mar. See Exhibit 1, Ramos' deposition at p. 136, l. 18-24, and p. 137.

30. On July 30, 2013, the CELS issued a $3,000.00 check payable to Víctor Ramos. See Exhibit 15.

31. On August 8, 2013, during a pre-convention meeting held at Wyndham Río Mar, a representative of the CELS gave two (2) checks to Brenda Rodríguez ("Rodríguez"), an Accounts Receivable employee, one for payment of the hotel as per the convention contract and the other written out to the order of Víctor Ramos. See Exhibit 6, Wyndham Río Mar's Answers

6

to Plaintiffs' Set of Interrogatories and Requests for Production of Documents, ¶15; see also Exhibit 18, Aponte's deposition at p. 11, l. 6-13.

32. Rodríguez gave the check written out to Víctor Ramos to Javier Rosado ("Rosado"), Wyndham Río Mar's Banquets Manager, during the pre-convention meeting, because Rosado offered to bring the check to Víctor Ramos when Rosado went to the Country Club area. See Exhibit 6, Wyndham Río Mar's Answers to Plaintiffs' Set of Interrogatories and Requests for Production of Documents, ¶15; see also Exhibit 18, Aponte's deposition at p. 11, l. 14-21.

33. Rodríguez then informed Wyndham Río Mar's Comptroller, Héctor Aponte ("Aponte"), that she had received two (2) checks. See Exhibit 6, Wyndham Río Mar's Answers to Plaintiffs' Set of Interrogatories and Requests for Production of Documents, ¶15; see also Exhibit 18, Aponte's deposition at p. 11, l. 6-13.

34. Aponte then asked Rodríguez to see the check written out to Víctor Ramos, but Rodríguez informed him that she had given the check to Rosado. See Exhibit 6, Wyndham Río Mar's Answers to Plaintiffs' Set of Interrogatories and Requests for Production of Documents, ¶15; see also Exhibit 18, Aponte's deposition at p. 11, l. 14-21.

35. Aponte then asked Rosado to see the check, and Aponte made a photocopy of it. Aponte then returned the original check to Rosado who, in turn, gave it to Víctor Ramos. See Exhibit 6, Wyndham Río Mar's Answers to Plaintiffs' Set of Interrogatories and Requests for Production of Documents, ¶15; see also Exhibit 18, Aponte's deposition at p. 11, l. 23-24, and p. 12, l. 1-5; see also Exhibit 1, Ramos deposition at p. 156, l. 18-19.

36. After receiving the $3,000.00 check, Ramos went to the bank and cashed it. See Exhibit 1, Ramos' deposition at p. 157, l. 4-10.

37. Ramos prepared a breakdown of the $3,000.00 which included a $300 fee for himself. See Exhibits 19 and 20; see also Exhibit 1, Ramos' deposition at p. 157, l. 11-17.

38. Ramos was on schedule to work as Wyndham Río Mar's Tournament Coordinator during the weekend of the CELS Annual Convention. See Exhibit 1, Ramos' deposition at p. 144, l. 12-15, and p. 145, l. 11-17.

39. The CELS Board of Directors were not aware that Ramos would collect any fee from the $3,000.00. See Exhibit 21; see also Exhibit 6, Wyndham Río Mar's Answers to Plaintiffs' Set of Interrogatories and Requests for Production of Documents, ¶15.

40. Ramos did not inform anyone at Wyndham Río Mar that he was going to receive a check under his name from a Wyndham Río Mar client (the CELS). See Exhibit 6, Wyndham Río Mar's Answers to Plaintiffs' Set of Interrogatories and Requests for Production of Documents, ¶15.

41. Ramos did not inform anyone at Wyndham Río Mar that he personally would deduct a $300 fee from the client's money. See Exhibit 6, Wyndham Río Mar's Answers to Plaintiffs' Set of Interrogatories and Requests for Production of Documents, ¶15.

42. On August 9, 2013, Ramos received an Associate Performance Action Form indicating as follows:

> Víctor, on 8/8/2013 you received a check payable under your name for $3,000 from one of our clients, Colegio de Ingenieros y Agrimensores de Puerto Rico. When questioned about it, you mentioned that this money was going to be distributed among the Golf Pro's working the tournament. However, the breakdown of this money included a fee of $300 for yourself.

> Víctor, you didn't follow the proper procedures by:
>
> *Not telling the hotel (nor your manager nor accounting) that you were going to receive a check under your name for $3,000 from one of the hotel's clients playing a golf tournament in the property.
>
> *Receiving $300 from this $3,000 (client's money) without telling the hotel (nor your manager or accounting)
>
> This is a violation to company policies and procedures, as mentioned in the Employee handbook page 15: "v. Failure to comply with Company or Hotel policies and/or directives, including, without limitation, the policies and procedures outlined in the Employee Handbook." Also, as mentioned in the Business Principles Book, page 21: "All employees occupy a position of trust with the Company and, as a result, have a duty of loyalty to make decisions and conduct themselves in a manner that is in the Company's best interests. Employees are required to avoid any relationship or activity that might create or give the appearance of a conflict between their personal interests and the interests of Wyndham Worldwide or its subsidiaries."

See Exhibit 22.

43. On August 9, 2013, Ramos was interviewed as part of the investigation carried out by Wyndham Río Mar. See Exhibit 6, Wyndham's Answers to Plaintiffs' Set of Interrogatories and Requests for Production of Documents, ¶15.

44. Regarding the $300 fee, Ramos explained that he had been given permission by the tournament chairman in 2012 to deduct a personal fee, however, that person was no longer with the CELS, and Ramos did not seek permission in 2013 to do the same. See Exhibit 6, Wyndham's Answers to Plaintiffs' Set of Interrogatories and Requests for Production of Documents, ¶15.

45. The year before, 2012, the CELS' golf tournament was held at Palmas del Mar, not at Wyndham Río Mar. See Exhibit 1, Ramos' deposition at p. 186, l. 1-8.

46. On August 9, 2013, Ramos provided a written statement indicating as follows:

> On Wednesday (sic) August 8, [2013] I received a check written out to me in the amount of $3,000 to be distributed among the golf professionals as prize for the CELS' Pro Am. This check was written out to my name to speed-up the payment to the professionals[. A]mong the distribution, there is $300 that were paid to me for the work I perform for the tournament and the remaining was divided $800 for the first place, $600 second place, $400 third place, and the rest of the players received $150 each for participating. I have not received any additional payment for any tournament held at Río Mar. Any doubt regarding the distribution you may contact the professionals.

See Exhibit 23. (Translations ours).

47. As a result of this incident, Ramos was suspended until August 15, 2013, pending the outcome of the investigation. See Exhibit 22; see also Exhibit 24, Wyndham Río Mar's corporate deposition at p. 27, l. 7-9.

48. Ramos was terminated on August 15, 2013. See Exhibit 25 and 26.

49. After Ramos' termination, the duties he used to perform as Tournament Coordinator were distributed among Figueroa and Jeannette González (Golf Shop Manager). See Exhibit 1, Ramos' deposition at p. 122, l. 20-24, and p. 123, l. 1-7; see also Exhibit 24, Wyndham Río Mar's corporate deposition at p. 35, l. 20-25.

50. At all times pertinent to this action, Kelli Joseph ("Joseph"), was Wyndham's corporate Human Resources Regional Director. See Exhibit 27, Joseph's deposition at p. 6, l. 20-25, and p. 7, l. 1-2. and Exhibit 28, Vargas' deposition at p. 10, l. 2-11. As such, Joseph provided consulting advice to Wyndham Río Mar's human resources department as they managed their day-to-day interactions. See Exhibit 27, Joseph's deposition at p. 7, l. 3-7.

51. As Wyndham's corporate Human Resources regional Director, Joseph's duties were not to recommend disciplinary measures against any Wyndham Río Mar employee, but,

rather, when consulted by the local Human Resources department at Wyndham Río Mar, she either supported or not the specific disciplinary measure brought to the table. See Exhibit 27, Joseph's deposition at p. 7, l. 12-23; see also Exhibit 24, Wyndham Río Mar's Corporate Deposition at p. 31, l. 15-17.

52. Joseph did not make final decisions as to employee discipline in Wyndham Río Mar, but, rather, Wyndham Río Mar's General Manager. See Exhibit 27, Joseph's deposition at p. 8, l. 3-8.

53. At all times pertinent to this action, Danny Williams was Wyndham Río Mar's General Manager. See Exhibit 29, Danny Williams' Deposition

54. At all times pertinent to this action, Jeff Willenberg was Wyndham Río Mar's Director of Golf. See Exhibit 30, Jeff Willenberg's Statement Under Penalty of Perjury at ¶2.

55. At all times pertinent to this action, Johanna Vargas was Wyndham Río Mar' Senior Human Resources Manager. See Exhibit 28, Vargas' deposition at p. 9, l. 9-11.

56. Ramos' termination was recommended to Joseph by the Wyndham Río Mar's local management and she supported said decision. See Exhibit 27, Joseph's deposition at p. 8, l. 22-25, and p. 17, l. 21-23; see also Exhibit 28, Vargas' deposition at p. 44, l. 10-19.

57. Joseph got involved in the matter of the termination of Ramos after she received an email from Vargas, sharing the findings of the investigation. See Exhibit 27, Joseph's deposition at p. 9, l. 1-6; see also Exhibit 26.

58. From the emails Vargas sent Joseph, see Exhibit 26, Joseph became convinced that Ramos had incurred in gross misconduct and that is why Joseph supported the recommendation to terminate him. See Exhibit 27, Joseph's deposition at p. 13, l. 10-15.

59. From the information Joseph received from Wyndham Río Mar's Human Resources department, Joseph concluded that Ramos incurred in conflict of interests, as he distributed funds to himself without the knowledge of the client (CELS) or the management of the hotel. See Exhibit 27, Joseph's deposition at p. 16, l. 16-21, p. 21, l. 22-25, and p. 22, l. 1.

60. Joseph did not know Ramos' age at the time of his termination. See Exhibit 27, Joseph's deposition at p. 21, l. 18-19.

61. Joseph did not review Ramos' personnel file prior to his termination. See Exhibit 27, Joseph's deposition at p. 13, l. 4-6.

62. Danny Williams, as Wyndham Río Mar's General Manager, made the final decision to terminate Ramos. See Exhibit 24, Wyndham Río Mar's Corporate Deposition at p. 14, l. 16-19, and Exhibit 29, Danny Williams' deposition at p. 14, l. 1-3.

63. Prior to his termination, Ramos relationship with everyone at the Hotel was good. See Exhibit 1, Ramos' deposition at p. 106, l. 16-21.

64. Ramos relationship with Vargas was "well" and, prior to his termination, he never had any employment issue with her. See Exhibit 1, Ramos' deposition at p. 103, l. 11-23.

65. Ramos relationship with Williams was "well". See Exhibit 1, Ramos' deposition at p. 105, l. 6-10.

66. Williams often visited the Country Club where Ramos worked and they never had any problems. See Exhibit 1, Ramos' deposition at p. 105, l. 15-23.

67. Ramos does not know Joseph and has never met her. See Exhibit 1, Ramos' deposition at p. 106, l. 12-15.

68. Ramos "can't recall" if Johanna Vargas ever made any discriminatory comment to him. See Exhibit 1, Ramos' deposition at p. 107, l. 4-23.

69. Vargas never mentioned anything to Ramos regarding his age. See Exhibit 1, Ramos' deposition at p. 107, l. 24, and p. 108, l. 1-2.

70. Williams never say anything discriminatory to Ramos him, nor anything about his age. See Exhibit 1, Ramos' deposition at p. 108, l. 15-23.

71. Ramos does not recall whether anyone at the Hotel ever said anything discriminatory to him. See Exhibit 1, Ramos' deposition at p. 109, l. 6-13.

72. Ramos feels that his termination is related to his age exclusively because he worked for 27 years at Río Mar, he was 60 years old at the time of his termination, and the duties he used to carry out were distributed between Herminio Figueroa and Jeannette González. See Exhibit 1, Ramos' deposition at p. 198, l. 6-24, and p. 199, l. 1.

73. Ramos does not believe that Willenberg, Williams, Aponte, Vargas or Joseph harbored any ill feelings against him. See Exhibit 1, Ramos' deposition at p. 125, l. 17-24, and p. 126, l. 1-15.

74. At no point was Ramos' age ever discussed, either during Willenberg's time working with Ramos at Wyndham, during the investigation leading up to Ramos' termination, or at his termination. The decision to terminate Ramos was based solely on the incident surrounding the CELS' check, which the Wyndham believed reflected dishonesty on Ramos' part. See Exhibit 30, Willenberg' Statement under Penalty of Perjury, ¶20.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, on May 31, 2016.

WE HEREBY CERTIFY that on this date, we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

**SCHUSTER AGUILÓ LLC**
PO Box 363128
San Juan, Puerto Rico 00936-3128
Telephone: (787) 765-4646
Telefax: (787) 765-4611


s/ Shiara L. Diloné-Fernández
**Shiara L. Diloné Fernández**
USDC PR No. 222104
sdilone@salawpr.com


s/Andrés C. Gorbea-Del Valle
**Andrés C. Gorbea-Del Valle**
USDC-PR Bar No. 226313
agorbea@salawpr.com