# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

VICTOR RAMOS-SANTIAGO, ET AL.,

    Plaintiffs,

v.

WHM CARIB, LLC, ET AL.,

    Defendants.

**Civil No. 14-1087 (SEC)**

## MEMORANDUM AND ORDER

Plaintiff Victor Ramos moves the Court to reconsider its Opinion granting in part summary judgment for his employer, WHM Carib, LLC (Wyndham). Ramos-Santiago v. WHM Carib, LLC, --- F. Supp. 3d ---, Civ. No. 14-1087 (SEC), 2017 WL 1025784 (D.P.R. 2017). There, the Court dismissed Ramos' age discrimination claim under Puerto Rico Law No. 100–1959, P.R. Laws Ann. tit. 29, § 146 et seq., and allowed his wrongful termination claim under Puerto Rico Law No. 80–1976, id., §§ 185a-185m, to proceed to the jury. For the sake of brevity, the Court will not rehash the factual and procedural background, which is detailed in the Opinion. To provide some context, suffice it to say that Wyndham—the operator of the Río Mar Hotel—fired Ramos after an investigation revealed that he received a $3,000 check from one of its clients, and kept $300 of these funds to himself without authorization. The background is augmented as necessary in the following pages.

A motion for reconsideration is warranted only when "the original judgment evidenced a manifest error of law, if there is newly discovered evidence, or in certain other narrow situations." Global Naps, Inc. v. Verizon New England, Inc., 489 F.3d 13, 25 (1st Cir. 2007). But it "is not the venue to undo procedural snafus or permit a party

to advance arguments it should have developed prior to judgment, nor is it a mechanism to regurgitate old arguments previously considered and rejected." Biltcliffe v. CitiMortgage, Inc., 772 F.3d 925, 930 (1st Cir. 2014) (internal citations and quotation marks omitted).

Ramos posits that the Court made a manifest error of law in its application of the summary judgment standard. At bottom, he argues that in dismissing his age discrimination claim, the Court neither construed the record in "the light most flattering" to him nor resolved all reasonable inferences in his favor. Soto-Padró v. Public Bldgs. Authority, 675 F.3d 1, 4 (1st Cir. 2012). The Court disagrees. It was precisely because the Court drew all inferences in Ramos' favor that it allowed his wrongful termination claim to proceed. But Ramos's age discrimination claim demands a higher burden of proof, one which he did not meet. Even granting all reasonable inferences in his favor, the age discrimination claim was inevitably doomed.

Ramos demurs. In his motion for reconsideration, Ramos candidly admits that the investigation began only after Wyndham's comptroller, Hector Aponte, received a $3,000 check from CELS (Wyndham' client) that was made payable to Ramos. Docket # 159, p. 2. Ramos also concedes that the investigation later revealed that it was he who requested CELS to issue the check payable to his name, and that he kept $300 from these funds to himself without authorization from either CELS or Wyndham. Id. Despite all of this, Ramos insists that there is sufficient evidence to support a reasonable inference that Wyndham's officers took advantage of this situation to cover for age discrimination. So viewed, Ramos effectively concedes that Wyndham proffered enough evidence to rebut Law 100's presumption that his discharge was motivated by age discrimination, but challenges the Court's determination that the record lacks sufficient evidence to establish pretext.

Throughout his motion, Ramos insists that he was not fired for taking the $300 without authorization. Instead, he sustains that he was dismissed for "not telling" Wyndham that he was going to receive the $3,000 check under his name and then pay

himself $300 from these funds. To support this claim, Ramos first points to the deposition testimony of Wyndham's General Manager, Danny Williams, who made the final decision to terminate him:

> Counsel: [D]o you agree that Victor Ramos was suspended and ultimately fired for the following two reasons? ... Number 1, not telling the company that he was going to receive a check from a client made out to him. And Number [2], not telling the company that that check included $300 for him; is that correct?
>
> Williams: Yes
>
> Counsel: And he was not disciplined for anything else. Correct?
>
> Williams: To the best of my knowledge, correct, yes.

Docket # 159, p. 3.

This argument is weak for two reasons. First, the probative value of this exchange is doubtful; Williams answered a question loaded with a false premise. The check did <u>not</u> include $300 for Ramos; he took it without authorization. Second, Ramos conveniently omits that Williams followed the recommendation of Wyndham's Human Resources Manager, Johanna Vargas,[1] <u>see</u> Docket # 123-6, pp. 9 & 24, who repeatedly declared that the reason why she did not recommend a lesser sanction was that Ramos took $300 from a client without authorization. <u>See</u> Docket # 137-2, pp. 63-72, 102-105.

Next, Ramos points to an email where his supervisor, Jeff Willenberg, informs comptroller Aponte that "as in previous tournaments," CELS agreed to give Ramos the $3,000 check to distribute as cash prize between the PGA Pros and that the check was supposed to be delivered to Ramos, not to Wyndham's accounting department. Docket # 156, pp. 3-4. According to Plaintiffs, this should lead to a reasonable inference that it was normal for the Hotel not to get involved in money distribution during golf

---

[1] Vargas was the person designated by Wyndham pursuant to Fed. Civ. P. 30(b)(6) to testify about Ramos' disciplinary process. <u>See</u> Docket # 123-6, pp. 9.

tournaments and that Ramos' conduct conformed to his past practice with CELS. But this proposed inference leads him directly into a Catch-22: as Wyndham's employee, Ramos should not have been involved in the prize distribution either.

Also, the evidence on record belies any inference that Ramos' actions mirrored his past practice with CELS. Recall that when Ramos coordinated the CELS tournament in 2012 at Palmas del Mar, both the prize money and his fee were channeled through the Palmas del Mar Athletic Club. More to the point, his $300 fee was approved by the tournament chair at the time. For the 2013 CELS tournament at Wyndham, in contrast, Ramos took it upon himself to be in charge of the money distribution and to pay himself from these funds without authorization.

To further support the notion that he was fired only for not disclosing the transaction to Wyndham, Ramos relies on an email from his supervisor. In response to a request by HR Manager Vargas, Willenberg summarized a conversation he had with a CELS's representative during the investigation and provided his initial recommendation regarding the proper disciplinary action to take against Ramos. The email reads:

> On Friday August 9, during the investigation of Ramos, I called Sr. Eddy Reyes, one of the tournament board members for the [CELS] golf tournament. I asked Eddy what the process was to pay the pros and he replied that it was agreed that $3,000 would be given to the pros and [Ramos] would get a check from [CELS] and disperse the monies. I asked Mr. Reyes if the board was aware that [Ramos] paid a fee of $300 to himself from the $3,000 check, and his reply was that he and the rest of the board were not aware. In our meeting with [Ramos], he stated that he was given permission to deduct a fee by the tournament chairman last year, but that person is no longer with the company.
>
> My recommendation: Written warning and uphold existing suspension. The monies were approved by the committee, and the money was to go to the pros not the company. I truly believe that Victor felt he was doing the right thing, he is the one that provided the evidence to us. His fee paid to himself had been done previously. The written warning and suspension are actions taken for not notifying the company on how the money would be dispersed, not notifying his executive committee member or supervisor of receiving a personal check from the company.

Docket # 138-1, p. 1.

According to Ramos, "Willenberg thought that the only thing [he] did wrong was failing to tell Wyndham of the check and fee, not actually receiving the check and fee." Docket # 156, p. 4. This may be true, but it does not take Ramos very far.

Later in an affidavit, Willenberg clarified that after he sent this email, Vargas explained that from a Human Resources perspective, taking the $300 without anyone's authorization or knowledge was cause for termination. Docket # 125-31, ¶ 16. After this explanation, Willenberg "aligned" himself with her recommendation to terminate Ramos. Id.

Ramos moved to strike Willenberg's affidavit arguing, among other things, that it was inconsistent with his deposition testimony, since Willenberg never mentioned that he changed his recommendation. Docket # 138, pp. 3-5. In the Opinion, the Court did not address this argument since it was immaterial to the decision. But given Ramos' insistence that his unauthorized appropriation of $300 had no bearing on his termination, the Court shall oblige.

Ramos invokes the sham affidavit doctrine under which a party that "has given 'clear answers to unambiguous questions' in discovery…cannot 'create a conflict and resist summary judgment with an affidavit that is clearly contradictory,' unless there is a 'satisfactory explanation of why the testimony [has] changed.'" Escribano-Reyes v. Prof'l Hepa Certificate Corp., 817 F.3d 380, 386 (1st Cir. 2016) (quoting Hernández–Loring v. Universidad Metropolitana, 233 F.3d 49, 54 (1st Cir. 2000)). This doctrine, however, does not apply "if the deposition and the later sworn statement are not actually contradictory," or if "the later sworn assertion addresses an issue that was not, or was not thoroughly or clearly, explored in the deposition." Palazzo ex rel. Delmage v. Corio, 232 F.3d 38, 43 (2d Cir. 2000). Neither does it "'bar a party from 'elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition.'" Malave-Torres v. Cusido, 919 F. Supp. 2d 198, 203 (D.P.R. 2013) (quoting Nelson v. City of Davis, 571 F.3d 924, 928 (9th Cir. 2009)). And therein lies the rub. Ramos'

counsel did not ask Willenberg clear and unambiguous questions. Moreover, a holistic reading of the deposition reveals that Willenberg's affidavit is actually consistent with his testimony.

The source of the alleged inconsistency is a handwritten note (the record does not reveal the author) that appears in the copy of the above-transcribed email containing Willenberg's initial recommendation. The note, dated August 13, 2013, reads: "after discussing with Jeff Willenberg, Hector Aponte and Johanna Vargas in a meeting at 2:00 p.m., our recommendation is termination of employment." Docket # 138-1, p. 1.

During the deposition, Ramos' counsel showed Willenberg a copy of this email and asked him regarding the meeting referenced in the handwritten note. Willenberg, however, became confused with the line of questioning and began testifying about another meeting held days before the one referenced in the handwritten note.

The record shows that Willenberg and Vargas met twice to discuss Ramos' fate. The first meeting took place on Friday August 9, the same day that Wyndham suspended Ramos pending further investigation. See Docket # 45-8. It was during or after this meeting when Vargas first requested Willenberg's recommendation. See Docket # 138, p. 2. She sent a follow-up email the next Monday. Id. Willenberg's response came via the above-transcribed email in the morning of August 13, and did not mention termination as the proper sanction for Ramos. Shortly after receiving this email, Vargas called for another meeting later that day. It was in this second meeting—both Willenberg and Vargas agree—when Vargas convinced Willenberg that termination was the proper sanction because Ramos had taken $300 without authorization. The handwritten note refers to this second meeting.

It is true that, in his deposition, Willenberg never mentioned that he changed his recommendation after this second meeting. But Ramos' counsel did not put much effort in getting this information out. At the very least, he could have set the stage for his line of questioning by confirming with Willenberg that there were two different meetings regarding Ramos' disciplinary action, and then asking questions about each meeting

separately. Indeed, the fact that there were two meetings is not evident by reading the deposition alone. The lack of clarity in counsel's line of questioning resulted in Willenberg's confusion. While counsel was trying to ask Willenberg about the second meeting, Willenberg thought that the questions were about the first. The following exchange should have alerted counsel of the disjoint:

> Counsel: Okay. Was anyone, meaning Johanna, Héctor and you, against terminating [Ramos]?
>
> Willenberg: Well, obviously, <u>my notes are here</u>. <u>In that meeting</u>?
>
> Counsel: Yes.
>
> Willenberg: I don't think at <u>that meeting</u> we were discussing termination. I think <u>we were still discussing and investigating.</u> I don't recall us discussing terminations or anything like that. I think that – if I recall, that <u>we made a decision after calling Mr. Reyes</u> during this meeting and asking him about the check and getting the information <u>that we would suspend him and continue the investigation</u>.

Docket # 123-3, pp. 30-32 (emphasis added).

Evidently, when Willenberg said "obviously, my notes are here," he was not referring to the handwritten note (which again, he did not write), but to content of the email he had sent to Vargas, which referenced events that took place the day of the first meeting. Counsel knew that both Willenberg's call to Mr. Reyes (CELS' representative) and the decision to suspend Ramos pending further investigation happened during the first meeting.

In fact, Ramos' counsel admits that he perceived some confusion in Willenberg's responses. Counsel explained that once he noticed "the discrepancy between the [handwritten] note and Willenberg's testimony," he "then again asked [Willenberg] specifically about the [handwritten] note." Docket # 156, p. 4. But the truth is that, regarding the handwritten note, counsel did not ask a question; he made a statement:

> Counsel: Yeah, <u>but if your read the note</u>, as I see it, "After discussing with Jeff Willenberg, Héctor Aponte and Johanna Vargas in a meeting at 2 p.m., our recommendation is termination." I guess from employment.
>
> Willenberg: Okay. <u>This email was sent to me by [Johanna Vargas]</u>.[2] And I think <u>this was a couple of days after the meeting</u>. And she asked me personally, her, my recommendation <u>in that meeting</u>.
>
> Counsel: And your recommendation was?
>
> Willenberg: And that my recommendation was that we—it should be a written warning, uphold the suspension and not terminate.

Docket # 123-3

Willenberg's response shows that he was not testifying about what transpired in the second meeting, when he "aligned" himself with Vargas' recommendation. Rather, his testimony was about the recommendation he sent via email in the morning of August 13 in response to Vargas' requests. The second meeting took place hours after Vargas received Willenberg's email—apparently at 2:00 p.m.

The short of it is that Willenberg's testimony was not inconsistent, counsel's questions were not very clear, and counsel never asked Willenberg directly whether he ever changed his recommendation. And he should have asked this question since, in a discovery related motion filed shortly before the deposition, Ramos argued that "it [was] of the utmost importance to determine…whether Mr. Willenberg was (1) overruled in his recommendation, or (2) convinced to change his mind…" Docket # 56, p. 6. Any confusion or inconsistency between Willenberg's deposition testimony and his affidavit stems from counsel's failure to clarify an issue whose importance was admittedly known before the deposition. These circumstances do not call for the application of the sham

---

[2] Willenberg first testified that the email was sent by another employee named Kerania Olmo, but later clarified that it was Vargas. <u>See</u> Docket # 123-3, p. 31.

affidavit doctrine. Ramos' motion to strike Willenberg's affidavit on this ground is denied.³

Ramos' remaining arguments for reconsideration fare no better. For instance, Ramos insists that a reasonable inference must be made that there was nothing wrong with his conduct because Wyndham never asked him to return the $300. But this was not Wyndham's money. And Wyndham's approach of notifying CELS of the situation was reasonable. Then, it was up to CELS to ask Ramos to return the money if it so wished. And regardless, this would not cure the fundamental problem that he took the money without authorization in the first place.

In a similar vein, Ramos posits that Wyndham "tacitly" allowed him to pay himself the $300 without authorization because it knew that he performed paid PGA work at the same time as he worked for Wyndham and because it was normal practice that PGA-affiliated tournaments were held at Rio Mar.⁴ True, Wyndham knew that Ramos had a side job with the PGA. But there is no evidence on record showing that he performed this work during Wyndham's time. Even if that was the case, there is no proof that Wyndham knew about it. And the Court fails to see how the fact that PGA-affiliated tournaments were routinely held at Río Mar implies that Wyndham tacitly gave Ramos its seal of approval to pay a fee to himself from tournament money pools. If anything, that these tournaments were routinely held at Río Mar actually undermines his "tacit approval" argument. This is so because Ramos stressed that this was the first time that he received money from an entity other than Wyndham for coordinating tournaments at Río Mar. See Docket ## 123-1, p. 2 & 123-7. No reasonable inference can be drawn that

---

³ In any event, even if Willenberg's affidavit had been stricken and assuming (for summary judgment purposes) that he maintained his initial recommendation, any disagreement with Vargas as to the proper disciplinary action for Ramos' offense would not have defeated summary judgment.

⁴ He also points out that Wyndham never requested him to report the tournaments that he worked for the PGA or the payments that he received for this work but he makes no attempt to explain how this is relevant and the Court fails to grasp the logic behind his argument.

Wyndham "tacitly" approved of Ramos' paying unauthorized fees to himself simply because there was never an occasion for Wyndham to do so.

In a further attempt to establish pretext, Ramos points out Wyndham's General Manager never considered Ramos' clean disciplinary record, his evaluations, and that Willenberg initially advocated against termination. In a different scenario, these circumstances could help. Not here.

Recall that the General Manager relied on the recommendation from Human Resources. Ramos suggests, without any supporting authority, that Wyndham's General Manager had to evaluate *de novo* all the circumstances surrounding his termination, including his disciplinary record and employment evaluations. This argument would have some bite if Ramos had presented evidence that this was the General Manager's routine practice when deciding whether to terminate employees. But all we have here is a decision maker relying on a facially valid recommendation for termination from the human resources department. The Court fails to see anything wrong with that. See Vélez Rivera v. Agosto Alicea, 334 F. Supp. 2d 72, 91 (D.P.R. 2004) (decision-maker entitled to qualified immunity in a political discrimination case because his actions "were objectively reasonable in light of the recommendations he received from two experts in human resources administration"), aff'd 437 F.3d 145 (1st Cir. 2006). Further, the evidence demonstrates that the HR manager took into account Ramos' clean disciplinary record before making her recommendation. During the decision-making process, Vargas sent an email noting that Ramos had "[n]o previous disciplines in file." Docket # 156-6, p. 1.

Despite his perfect disciplinary record, Ramos was given the boot. While some could characterize Wyndham's decision as insensitive, others could say it reflects Wyndham's appreciation of the gravity of the offense. Whatever the case, these facts do not suggest pretext.

Ramos further argues that the Court erred in concluding that there was no evidence of differential treatment based on age. Ramos reiterates that he was treated more harshly than a younger Willenberg. In the previous opinion, the Court rejected this argument finding that Willenberg's conduct—the above-the-table receipt of a participation fee during his day off—even if prohibited, was not similar to Ramos' offense of taking $300 without authorization. Ramos-Santiago, 2017 WL 1025784, at *7. Before reaching this conclusion, the Court noted that "when the issue of the check under Ramos' name first surfaced, Aponte (Wyndham's comptroller) suggested to Willenberg not to take a participation fee," but found that ultimately, their communication regarding this matter was inconclusive. Id. Ramos takes issue with this finding and presses that Willenberg's purported offense was similar to his. According to Ramos, Willenberg affirmatively lied to Aponte, telling him that he was not going to take a participation fee and then taking a $150 fee from Ramos after the tournament was over.

To refute the Court's finding that the communication between Willenberg and Aponte was inconclusive, Ramos highlights an email exchange where Willenberg never says conclusively that he was not going to take a participation fee. See Docket # 123-11, pp. 1-2. Actually, the exchange ends with Willenberg writing to Aponte that they would discuss the matter later. Regardless, even assuming that Willenberg actually told Aponte that he was not going to take a participation fee, nothing on record suggests that Willenberg had an obligation to follow through. For instance, Ramos does not allege that Aponte was Willenberg's superior or that Willenberg was required to follow Aponte's orders or suggestions. Neither is there evidence that, at the time, Wyndham prohibited employees from receiving participation fees for playing in golf tournaments at Río Mar during off-hours. To the contrary, HR manager Vargas declared that this was not a violation of company policy at the time and that she told Willenberg not to play in subsequent tournaments at Río Mar to avoid any future misunderstanding. Docket # 123-18, pp. 76-78.

Simply put, even if Willenberg lied to Aponte, there is no evidence that he took someone else's money without authorization. He received $150 from Ramos, who was authorized by CELS to distribute $3,000 among PGA Pros playing at the tournament. And Willenberg was one of these PGA Pros. Ramos, on the other hand, was not a player and took $300 without authorization from either CELS or Wyndham. Thus, even if Willenberg had committed an offense, it was not sufficiently similar to that of Ramos for purpose of establishing differential treatment.

Finally, Ramos points out that his duties were absorbed by existing younger employees and argues that this is evidence of discrimination. Ramos contention is true only to the extent that it shows that Wyndham had a "continuing need" for Ramos' services. See Soto-Feliciano v. Villa Cofresi Hotels, Inc., 779 F.3d 19, 24 (1st Cir. 2015). But this is only relevant to establish an ADEA prima facie case, a claim that is not before this Court. And in any event, the inference of discrimination raised by a successful prima facie case is washed away when, as here, the employer presents a legitimate, non-discriminatory reason for the termination. At that point, it is up to the employee to show that the employer's reason is but a cover for age-based discrimination. For that purpose, it is not sufficient to recycle the fact that the employer reassigned duties to younger employees. Indeed, if courts were to adopt this position, it would mean pretext is but a foregone conclusion (for summary judgment purposes) whenever an employee was terminated and the employer had a continuing need for his services.

To be sure, evidence that the Wyndham had a "continuing need" for Ramos' services could be relevant to the pretext inquiry if Wyndham's justification for the termination was that his position had become obsolete. Cf. Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 52-53 (1st Cir. 2010) (positive performance evaluations can be relevant to the pretext inquiry, at least where poor performance is one of the justifications that the employer puts forward for the adverse employment action). But that was not the case here. The bottom line is that, in this case, the fact that Wyndham

reassigned Ramos' job duties to other younger employees proves nothing, at least with respect to the existence of age discrimination.

The motion for reconsideration **is denied**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 11th day of May 9, 2017.

                                                    S/ Salvador E. Casellas
                                                   SALVADOR E. CASELLAS
                                                   U.S. Senior District Judge